UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 9:16-CV-81537-ROSENBERG/HOPKINS

NURMI PROPERTY LLC,

    Plaintiff,

v.

SOURCEPOINT LLC,

    Defendant.
_____/

## ORDER DENYING PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS

**THIS CAUSE** is before the Court on Plaintiff's Motion for Judgment on the Pleadings and Memorandum of Law [DE 17]. The Court has carefully considered Plaintiff's Motion, Defendant's Response [DE 20], and Plaintiff's Reply [DE 21], and is otherwise fully advised in the premises. For the reasons set forth below, Plaintiff's Motion is **DENIED**.

### I.     INTRODUCTION

This is an action to remove a maritime lien claim and for declaratory and injunctive relief. Plaintiff Nurmi Property LLC ("Nurmi") owns the passenger vessel M/V ISLAND BREEZE II. After chartering the vessel from Nurmi, Defendant SourcePoint LLC ("SourcePoint") served a Notice of Claim of Lien against the vessel in the amount of $3,000,000 for certain gaming equipment remaining onboard. Nurmi asserts that SourcePoint's lien claim is invalid under the terms of several written agreements by which the parties are bound. SourcePoint counters that its lien claim arises from a maritime tort and, as such, is not precluded by any agreement. Based on the substance of the pleadings and attachments thereto, the Court concludes that Nurmi is not entitled to judgment as a matter of law.

## II.     BACKGROUND[1]

As the Court has already noted, Nurmi owns the passenger vessel M/V ISLAND BREEZE II. DE 1 ¶ 7; DE 7 ¶ 7. On or about May 15, 2013, Nurmi chartered the vessel to IBI Palm Beach, LLC ("IBI"). DE 1 ¶ 10; DE 7 ¶ 10. In connection with that charter, Nurmi and IBI executed a Charter Purchase Agreement, a copy of which is attached to Nurmi's Verified Complaint. *See* DE 1-1. The Charter Purchase Agreement contains the following provision:

> D. (1) Except for a lien for wages of stevedores, wages for the crew of the vessel, general salvage or salvage including contract salvage, and except for maritime tort liens covered (subject to a reasonable deductible) by insurance or protection and indemnity entry, Charterer will not create or suffer to be continued any security interest, lien, encumbrance or charge on the Vessel or any income therefrom. In due course, and in any event within thirty (30) days after the same becomes due and payable, the Charterer will pay or cause to be discharged or make adequate provision for the payment or discharge of all claims or demands which, if not paid or discharged, might result in the creation of a security interest, lien, encumbrance or charge against the Vessel or any income therefrom, and will cause the Vessel to be released or discharged from each such security interest, lien, encumbrance or charge therefor.

*Id.* at 6–7.[2] Nurmi alleges, and SourcePoint denies, that this no lien clause forbids SourcePoint's lien against the vessel. DE 1 ¶ 11; DE 7 ¶ 11.

Nurmi further alleges, and SourcePoint denies, that during the charter the vessel was subject to a preferred ship's mortgage, which also contains a provision prohibiting liens. DE 1 ¶¶ 12–13; DE 7 ¶¶ 12–13. A portion of the mortgage between Nurmi and SOUTHBank, dated June 7, 2012, is attached to Nurmi's Verified Complaint. S*ee* DE 1-2. The mortgage provides:

---

[1] Unless otherwise indicated, the facts set forth in this section are alleged in Plaintiff's Verified Complaint in Admiralty [DE 1] and admitted in Defendant's Answer and Affirmative Defenses [DE 7] or are drawn from the documents attached to these pleadings. *See* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").
[2] The Court refers to this provision as the "no lien clause" throughout the remainder of this Order.

"Without the prior written consent of Mortgagee there shall not be granted or incurred by any person any Lien [on the vessel], and Shipowner shall not suffer the same to be continued for any period of time whatsoever after the same shall become due and payable." *Id.* at 3. The mortgage further requires that Nurmi keep a copy of the mortgage onboard the vessel and prominently display a notice of mortgage reading substantially as follows:

> This vessel is encumbered by a preferred marine mortgage in favor of SOUTHBank, a Federal Savings Bank, pursuant to Chapter 313 of Title 46 of the United States Code, as amended. Under the provisions of said mortgage none of the owner, any charterer, the master of this vessel, or any other person has any right, power or authority to create, incur or permit to be imposed upon this vessel any lien, encumbrance, or other charge whatsoever other than for crews' wages or salvage, and such other liens as may be expressly permitted under such preferred mortgage.

*Id.*

Nurmi alleges, and SourcePoint denies, that "[a] 'No Lien' clause under maritime law placed charterer and third parties on notice that the charterer cannot, and owner will not, allow liens to attach or accrue to the vessel and specifically prohibits maritime liens or relying on the credit of the vessel." DE 1 ¶ 14; DE 7 ¶ 14. Nurmi further alleges, and SourcePoint denies, that a copy of the Charter Purchase Agreement, preferred ship's mortgage, and notice thereof were prominently displayed on the vessel at all relevant times and provided constructive notice to all that no liens against the vessel were permitted. DE 1 ¶¶ 15–17; DE 7 ¶¶ 15–17; DE 1-3 (copy of notice allegedly displayed on vessel).

At some point during the charter, IBI initiated bankruptcy proceedings. DE 1 ¶¶ 18–19; DE 7 ¶¶ 18–19. The charter of Nurmi's vessel was included among the assets of IBI's bankruptcy estate. DE 1 ¶ 20; DE 7 ¶ 20. On or about November 12, 2013, Nurmi and SourcePoint executed an Attornment Agreement in connection with SourcePoint's becoming a lender to IBI and obtaining a security interest in IBI's rights under the Charter Purchase

Agreement. DE 1 ¶ 21; DE 7 ¶ 21. The Attornment Agreement, a copy of which is attached to Nurmi's Verified Complaint, includes the following provision:

> 6. Release of Lien. Lender hereby releases any lien right Lender may have against the Vessel and or the Non-Removable Goods. Notwithstanding any provision of this Agreement or contained in the Security Interest in the event of a default under the Charter that is not cured by IBI, Lender or Successor Charter, within the applicable cure period, Nurmi shall have the right to cancel the Charter Agreement and retake possession of the Vessel. In the event Nurmi cancels the Charter Agreement and retakes possession of the Vessel, Nurmi shall allow Lender or Successor Charter access to the Vessel to remove the Vessel Equipment and any other assets of IBI described on Exhibit A on the Vessel encumbered by the Security Interest.

DE 1-4 at 3. The Attornment Agreement also provides: "If [SourcePoint] or another party acquires the Charter or succeeds to the interest of IBI under the Charter as a result of foreclosure, a voluntary assignment, through receivership or otherwise . . . then: (i) Nurmi and Successor Charterer [SourcePoint] shall be bound to each other under all the terms, covenants, and conditions of the Charter for the balance of the Charter with the same force and effect as if Successor Charterer [SourcePoint] was the charterer under the Charter," with certain exceptions. *Id.* at 2.

On or about March 1, 2015, as a result of IBI's default under its loan, SourcePoint took possession of the vessel and became the successor charterer to IBI. DE 1 ¶¶ 20, 22; DE 7 ¶¶ 20, 22. On August 9, 2016—after SourcePoint returned the vessel to Nurmi—SourcePoint served a Notice of Claim of Lien against the vessel, a copy of which is attached to Nurmi's Verified Complaint. DE 1 ¶ 24; DE 7 ¶ 24; DE 1-5. The Notice was also filed on the vessel's abstract of title and represents a cloud on the title of the vessel. DE 1 ¶ 25; DE 7 ¶ 25. SourcePoint's Notice of Claim of Lien indicates that the lien was established on January 9, 2014. *See* DE 1-5 at 2. The Notice further indicates that the nature of the lien claimed is as follows: "Necessaries supplied to the vessel: slot machines and related gaming equipment, furniture, chips, cards, surveillance cameras, slot tracking system and counting room and kitchen equipment." *Id.* The total amount

of the lien claimed is $3,000,000. *Id.* Nurmi alleges, and SourcePoint denies, that SourcePoint's lien claim is not valid and must be removed, and that as a result of the wrongful lien claim, Nurmi has been damaged. DE 1 ¶¶ 26–27; DE 7 ¶¶ 26–27.

Count I of Nurmi's Verified Complaint seeks to remove SourcePoint's lien pursuant to 46 U.S.C. § 31343(c)(2). Nurmi alleges, and SourcePoint denies, that when the lien was allegedly established in January of 2014, and when the lien claim was filed in August of 2016, the vessel was subject to the Charter Purchase Agreement, preferred ship's mortgage, and Attornment Agreement, all of which contained provisions prohibiting SourcePoint's lien, and that SourcePoint had both actual and constructive knowledge of the same. DE 1 ¶¶ 31–33; DE 7 ¶¶ 31–33. Nurmi further alleges, and SourcePoint denies, that on or about July 12, 2016, SourcePoint's counsel sent a letter by email to Nurmi's counsel regarding the return of the vessel from SourcePoint to Nurmi, which stated in part: "All fees have been paid through July 15, and there are no known liens or unpaid wage claims against the vessel." DE 1 ¶ 35; DE 7 ¶ 35; DE 1-9 (copy of letter). Nurmi alleges, and SourcePoint denies, that this was an intentional misrepresentation, as evidenced by SourcePoint's subsequent Notice of Claim of Lien.[3] DE 1 ¶ 37; DE 7 ¶ 37. Nurmi further alleges, and SourcePoint denies, that SourcePoint has failed to comply with Nurmi's demand that the lien be removed. DE 1 ¶¶ 34, 37; DE 7 ¶¶ 34, 37; DE 1-6 (demand letter). Finally, Nurmi alleges, and SourcePoint denies, that SourcePoint abandoned the vessel and the gaming equipment identified in SourcePoint's Notice of Claim of Lien, and that the gaming equipment constituted fixtures of the vessel at the time of abandonment; accordingly, the gaming equipment belongs to the vessel and SourcePoint has no legal right or title thereto.

---

[3] Nurmi omits a crucial sentence. In relevant part, the letter provides: "All fees have been paid through July 15, and there are no known liens or unpaid wage claims against the vessel. *However, that will not continue after July 15 without Nurmi's intervention.*" *See* DE 1-9 at 1 (emphasis added). The Court fails to see any misrepresentation.

DE 1 ¶¶ 39–40; DE 7 ¶¶ 39–40. Count II of Plaintiff's Complaint seeks declaratory and injunctive relief for the same reasons.

In its Answer, SourcePoint raises three affirmative defenses. First, SourcePoint alleges that it has filed a Satisfaction or Release of Mortgage, Claim or Lien or Preferred Mortgage with the United States Coast Guard National Vessel Documentation Center, and the Notice of Claim of Lien at issue in this case has been released. *See* DE 7 at 5; DE 7-1 (copy of the Satisfaction dated September 12, 2016). Second, SourcePoint alleges that Nurmi's Verified Complaint fails to state a cause of action for declaratory judgment or injunctive relief. *See* DE 7 at 5. Finally, SourcePoint alleges that Nurmi's Verified Complaint is moot because the Notice of Claim of Lien has been released. *See id.*

The Court takes judicial notice of the fact that, on October 23, 2016, Nurmi filed suit against PB Gaming LLC and Matthew B. Martorello in the Southern District of Florida. *See Nurmi Property LLC v. PB Gaming LLC et al.*, case no. 9:16-cv-81781-RLR. On January 12, 2017, that case and the instant case were consolidated for purposes of discovery, all pretrial activity, and trial. *See* DE 19. However, the Motion presently before the Court was filed on January 10, 2017—prior to consolidation—and does not refer to Nurmi's claims against PB Gaming LLC and Matthew B. Martorello. Accordingly, this Order does not address those claims and is limited to Nurmi's claims against SourcePoint arising from SourcePoint's lien.

In the Motion presently before the Court, Nurmi argues that SourcePoint's lien is invalid pursuant to the Charter Purchase Agreement, the preferred ship's mortgage, and the Attornment Agreement. While SourcePoint has since released its lien, Nurmi argues that this action and its claims are not rendered moot, as the Court may still award costs and attorney's fees, declare

6

SourcePoint's lien invalid, and enjoin any future lien.[4] Nurmi further argues that SourcePoint's affirmative defenses are insufficient to avoid judgment on the pleadings.

In its Response, SourcePoint argues that its lien is not prohibited under the terms of any written agreement by which the parties are bound, as its lien is a maritime tort lien for conversion of SourcePoint's gaming equipment and the contractual language at issue does not invalidate maritime tort liens as a matter of law.[5] Specifically, SourcePoint asserts that Nurmi converted gaming equipment owned by SourcePoint and assigned to PB Gaming LLC when it refused to allow SourcePoint or PB Gaming LLC to remove the equipment at the time SourcePoint returned the vessel to Nurmi. SourcePoint further asserts that it subsequently released its lien because it had previously assigned its rights to the gaming equipment to PB Gaming LLC. PB Gaming LLC then recorded the same lien, correctly identifying the lien as one for conversion rather than necessaries. SourcePoint asserts that its scrivener's error is not a defense to the claim of conversion and does not invalidate the maritime tort lien. Finally, SourcePoint argues that judgment on the pleadings is inappropriate because SourcePoint has denied Nurmi's allegations that the lien is invalid, that the equipment was abandoned or constituted fixtures of the vessel, and that the lien claim was made in bad faith.

In its Reply, Nurmi asserts that SourcePoint's lien is invalid if its rights in the gaming equipment had previously been assigned to PB Gaming LLC.[6] Nurmi further argues that

---

[4] The Court agrees that this action and Nurmi's claims against SourcePoint have not been rendered moot.
[5] In advancing this argument, SourcePoint appears to concede that a lien for Nurmi's breach of either the Charter Purchase Agreement or the Attornment Agreement is prohibited by the no lien clause in the Charter Purchase Agreement. However, for the reasons set forth in this Order, the Court is not convinced that this is correct. As SourcePoint has denied such allegations, the Court need not accept this premise as true for purposes of the Motion presently before it.
[6] There are no allegations regarding any assignment from SourcePoint to PB Gaming LLC in the pleadings filed in this case or the attachments thereto. In addition, while the Court notes the existence of a provision in the Charter Purchase Agreement prohibiting any assignment of the Agreement without Nurmi's express written consent, *see* DE 1-1 at 15, nothing in the pleadings or attachments thereto addresses whether SourcePoint complied with this

7

SourcePoint's lien is in fact a contract lien arising from Nurmi's breach of the Charter Purchase Agreement or the Attornment Agreement, not a tort lien, and is therefore prohibited by the terms of the written agreements between the parties. Finally, Nurmi argues that SourcePoint has failed to establish the existence of a valid maritime tort under applicable law.

### III. LEGAL STANDARD

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "Judgment on the pleadings is proper when no issues of material fact exist, and the moving party is entitled to judgment as a matter of law based on the substance of the pleadings and any judicially noticed facts." *Cunningham v. Dist. Attorney's Office for Escambia Cty.*, 592 F.3d 1237, 1255 (11th Cir. 2010) (quoting *Andrx Pharm., Inc. v. Elan Corp., PLC*, 421 F.3d 1227, 1232 (11th Cir. 2005)).

In determining whether a party is entitled to judgment on the pleadings, the Court accepts as true all material facts alleged in the non-moving party's pleading, and views those facts in the light most favorable to the non-moving party. *Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1335 (11th Cir. 2014) (citing *Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1370 (11th Cir. 1998)). "If a comparison of the averments in the competing pleadings reveals a material dispute of fact, judgment on the pleadings must be denied." *Id.* (citing *Stanton v. Larsh*, 239 F.2d 104, 106 (5th Cir. 1956)); *see also Bryan Ashley Int'l, Inc. v. Shelby Williams Indus., Inc.*, 932 F. Supp. 290, 293 (S.D. Fla. 1996).

---

provision. Accordingly, the Court cannot determine the effect of any assignment from SourcePoint to PB Gaming LLC on the validity of SourcePoint's lien at this stage of the proceedings.

## IV. DISCUSSION

Based on the substance of the pleadings and attachments thereto, the Court concludes that Nurmi is not entitled to judgment as a matter of law. First, none of the written agreements at issue prohibit maritime tort liens as a matter of law. Second, the Court cannot conclude that SourcePoint's lien is not a valid maritime tort lien. Third and finally, even if SourcePoint's lien is properly characterized as a contract lien rather than a maritime tort lien, the Court cannot conclude that the written agreements at issue prohibit such a lien.

**A.     None of the written agreements at issue prohibit maritime tort liens.**

Pursuant to the Attornment Agreement between Nurmi and SourcePoint, SourcePoint is bound by the terms of the Charter Purchase Agreement between Nurmi and IBI. *See* DE 1-4 at 3. The Charter Purchase Agreement, however, does not prohibit maritime tort liens. To the contrary, such liens are explicitly excluded from the no lien clause in the Charter Purchase Agreement. *See* DE 1-1 at 6–7 ("[E]xcept for maritime tort liens covered (subject to a reasonable deductible) by insurance or protection and indemnity entry, Charterer will not create or suffer to be continued any security interest, lien, encumbrance or charge on the Vessel or any income therefrom."). Nurmi does not argue, and the Court cannot determine from the pleadings and attachments thereto, that the lien at issue in this case is not "covered . . . by insurance or protection and indemnity entry." Accordingly, the Court cannot conclude that SourcePoint's lien—if properly characterized as a maritime tort lien—is prohibited by the Charter Purchase Agreement.

Likewise, the Court cannot conclude that the Attornment Agreement prohibits such a lien. That Agreement includes a provision pursuant to which SourcePoint "releases any lien right [SourcePoint] may have against the Vessel and or the Non-removable Goods." *See* DE 1-4 at 3.

Nurmi argues that this language encompasses both tort and contract liens. However, the Attornment Agreement is dated November 12, 2013. *See id.* The lien at issue in this case was not established until January 9, 2014. *See* DE 1-5 at 2. While SourcePoint may have released any lien rights it had as of November 12, 2013, the Court cannot conclude that the relevant language of the Attornment Agreement was also intended as a prospective release of any lien that may have subsequently arisen. In other words, the Court cannot determine that the Attornment Agreement prohibits SourcePoint's lien, whether that lien is properly characterized as a maritime tort lien or a contract lien.

Finally, the Court cannot conclude that the preferred ship's mortgage prohibits the lien at issue in this case, at least not in the manner Nurmi argues. Certainly, the terms of the preferred ship's mortgage appear to prohibit any liens against the vessel. *See* DE 1-2 at 3 ("Without the prior written consent of Mortgagee there shall not be granted or incurred by any person any lien thereon, and Shipowner shall not suffer the same to be continued for any period of time whatsoever after the same shall become due and payable."). However, the Court fails to see how SourcePoint is bound by the terms of a mortgage between Nurmi and SOUTHBank, particularly when SourcePoint denies any knowledge of its existence. *See* DE 1 ¶¶ 12–13, 15; DE 7 ¶¶ 12–13, 15. The preferred ship's mortgage appears to require only that Nurmi take action to prevent and to remove any liens against the vessel, whether by paying the amount of the lien or otherwise. It does not render SourcePoint's lien invalid as a matter of law, whether the lien is properly characterized as a maritime tort lien or a contract lien.

**B.    The Court cannot conclude that SourcePoint's lien is not a valid maritime tort lien.**

Having concluded that maritime tort liens are not prohibited under any of the written agreements at issue in this case, the Court turns next to whether SourcePoint's lien may properly

be characterized as a valid maritime tort lien. "[F]or a tort claim to be cognizable under admiralty jurisdiction, the activity from which the claim arises must satisfy a location test and it must have sufficient connection with maritime activity." *Broughton v. Florida Int'l Underwriters, Inc.*, 139 F.3d 861, 865 (11th Cir. 1998) (quoting *Alderman v. Pacific N. Victor, Inc.*, 95 F.3d 1061, 1064 (11th Cir. 1996)). The location test and the connection test, in turn, require the following:

> To satisfy the location test, the tort must have occurred on navigable water or the injury suffered on land must have been caused by a vessel on navigable water. With respect to the connection test, two issues must be considered: (1) whether, upon assessment of the general features of the type of accident involved, the "incident has a potentially disruptive impact on maritime commerce;" and (2) "whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity."

*Id.* (quoting *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995)). With respect to the tort of conversion in particular, "[i]n the admiralty context, as elsewhere, conversion is simply an intentional and wrongful exercise of dominion or control over a chattel, which seriously interferes with the owner's rights in the chattel." *Middleton v. M/V GLORY SKY I*, 567 F. App'x 811, 813 (11th Cir. 2014) (quoting *Evergreen Marine Corp. v. Six Consignments of Frozen Scallops*, 4 F.3d 90, 94 (1st Cir. 1993)).

At this stage of the proceedings, relying only on the pleadings and any attachments thereto, the Court cannot determine where any conversion of SourcePoint's gaming equipment may have occurred. Thus, the Court cannot conclude as a matter of law that the location test is not satisfied. While Nurmi asserts in its Reply that "[t]he vessel was laid up and out of navigation when the alleged tort occurred," *see* DE 21 at 4, nothing in the pleadings or attachments thereto supports this assertion.

The Court can and does conclude, however, that the tort of conversion of gaming equipment aboard a passenger vessel satisfies both prongs of the connection test. *See Weaver v. Hollywood Casino-Aurora, Inc.*, 255 F.3d 379, 386–87 (7th Cir. 2001) (concluding that a tort occurring on "a commercial boat engaged in the transport of passengers for profit (even if its ultimate end was gambling) . . . without doubt . . . disrupts its participation in maritime commerce" and that "[t]he general character of [such a boat's activity] relates to traditional maritime activity."); *Bay Casino, LLC v. M/V Royal Empress*, 199 F.R.D. 464, 466 (E.D.N.Y. 1999) ("[C]ourts have recognized that torts aboard entertainment vessels, including cruise ships, sightseeing ships, and casino boats satisfy the traditional maritime activity requirement."); *Young v. Players Lake Charles, L.L.C.*, 47 F. Supp. 2d 832, 835 (S.D. Tex. 1999) ("The PLAYERS III is a mobile riverboat casino fully and presently capable of, and actually, traveling on navigable waters. Courts have consistently stated that torts on such vessels satisfy the traditional maritime activity requirement."). Accordingly, the Court cannot conclude at this stage of the proceedings that SourcePoint's lien is not a valid maritime tort lien.

**C.    Even if SourcePoint's lien is properly characterized as a contract lien, the Court cannot conclude that the written agreements at issue prohibit such liens.**

Nurmi argues that SourcePoint's lien is properly characterized as a contract lien, not a maritime tort lien. Specifically, Nurmi asserts that any alleged failure on its part to return gaming equipment to SourcePoint gives rise to a claim for breach of the Charter Purchase Agreement or the Attornment agreement. *See* DE 21 at 2–3. Nurmi further argues that, because SourcePoint's lien is in fact a contract lien, it is prohibited by the Charter Purchase Agreement, Attornment Agreement, and preferred ship's mortgage.[7]

---

[7] As the Court has already concluded, neither the preferred ship's mortgage nor the Attornment Agreement renders SourcePoint's lien invalid as a matter of law at this stage of the proceedings, whether the lien is properly

As an initial matter, the Court cannot determine at this stage of the proceedings whether or not SourcePoint's lien is in fact a contract lien. The Court notes that there are a number of provisions in the Charter Purchase Agreement and the Attornment Agreement that Nurmi may have breached. For example, Article 8 of the Charter Purchase Agreement suggests that upon return of the vessel, Nurmi had no right to retain gaming devices or related equipment and materials that SourcePoint owned or leased from third parties. *See* DE 1-1 at 8. In addition, the Attornment Agreement requires that Nurmi permit SourcePoint to access the vessel to remove SourcePoint's equipment in the event Nurmi canceled the charter and retook possession of the vessel. *See* DE 1-4 at 3. However, the circumstances under which SourcePoint returned the vessel to Nurmi and whether or not Nurmi prevented SourcePoint from removing its gaming equipment cannot be determined at this stage of the proceedings. *See, e.g.*, DE 7 ¶¶ 39–40 (denying allegations that SourcePoint abandoned the vessel and gaming equipment); DE 1-9 (letter dated July 12, 2016 regarding return of vessel and dispute over gaming equipment). Accordingly, while SourcePoint's lien may arise from a breach of contract rather than an independent tort, the Court cannot determine that fact based upon the pleadings and attachments presently before it.

Moreover, even if SourcePoint's lien is properly characterized as a contract lien, the Court is not convinced that the Charter Purchase Agreement prohibits such a lien. For example, in *International Marine Towing, Inc. v. Southern Leasing Partners, Ltd.*, the court considered language strikingly similar to that used in the Charter Purchase Agreement:

> Neither the Charterer nor the Master of the Vessel shall have the right, power or authority to sell, assign, or transfer, or to create, incur or permit to be imposed upon the vessel any liens whatsoever except the crews' wages and salvage and inchoate operating expenses not discharged within sixty days from incurrance

---

characterized as a contract lien or a maritime tort lien. Accordingly, the Court addresses below only whether the Charter Purchase Agreement prohibits contract liens.

> . . . . The Charterer agrees to notify any person furnishing repairs, supplies, towage or other necessities to the Vessel that neither the Charterer nor the Master has any right to create, incur or permit to be imposed upon the Vessel any liens whatsoever except crews' wages and salvage as set forth hereinabove.

722 F.2d 126, 132 (5th Cir. 1983). The court determined that "[t]his clause does not undertake to deal with the power of the owner to subject his vessel to maritime liens through his breach of the charter." *Id.* (citing *Roberts v. Enternach*, 302 F.2d 370, 372–73 (5th Cir. 1962)). Instead, the court concluded as follows:

> [T]he clause does not speak to the issue of liens created by the owner's breach and does nothing to waive charterer's lien rights for damages caused by such a breach, especially considering our strong presumption against such a waiver. By its very terms, the clause deals only with the right of the charterer to create liens in favor of third parties, and does not bar the creation of liens in favor of [the charterer] as a result of a breach of the charter party by [the owner]."

*Id.* (internal citation omitted); s*ee also Roberts*, 302 F.2d at 372–73 & n.5 (concluding that a similar clause "has to do with the power of others—the master, agent, charterer, etc.—to subject the vessel to liens for work done by third parties at the request of those presuming to speak for the ship.").[8]

## V. CONCLUSION

For the foregoing reasons, it is **ORDERED AND ADJUDGED** that Plaintiff's Motion for Judgment on the Pleadings [DE 17] is **DENIED**.

**DONE AND ORDERED** in Chambers, Fort Pierce, Florida, this 15th day of May, 2017.

ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of record

---

[8] Decisions of the Fifth Circuit Court of Appeals issued prior to the close on business on September 30, 1981 are binding upon this Court. *See Bonner v. City of Prichard, Ala.*, 661 F.2d 1206 (11th Cir. 1981).